## MARTHA M. VOSS v. LeROY F. SCOTT AND OTHERS.[1]

April 4, 1930.

No. 27,816.

*M. G. Flaten* and *Robertson & Rerat,* for appellants.
*Bauers, Carlson & Beveridge,* for respondent.

STONE, J.

Plaintiff, claiming a rescission by mutual consent of an exchange of real estate, had a verdict against defendants for the value of the property with which she had parted. At the trial there was a separate controversy arising on the cross-complaint of defendant Inez Schultz against her codefendants. With that we are not now concerned. The present appeal is by the defendants other than Inez Schultz from an order denying their motion for judgment or a new trial.

[1]Reported in 230 N. W. 262.

There is much and irreconcilable conflict in the evidence. That for plaintiff is easily believable and now confirmed by the verdict. Very briefly, the story as gathered from the case for plaintiff is this. She was 43 years of age and without much experience either in schools or business. She owned a rooming house in Minneapolis. Plaintiff knew nothing of summer resorts, their values or earning power. Defendant Scott is a son of defendant Lou Colliton. He owned Sea Girt Inn, a summer resort at Orchard Lake in Dakota county. The Collitons had a mortgage on it. The defendants Scott and Colliton, operating through Mabel E. Hart, a realtor, and defendant Inez Schultz, interested plaintiff in the Sea Girt property with a view to a trade for her rooming house and other property. Defendant Schultz made her home with plaintiff, and the two were long-time and close personal friends, plaintiff trusting Mrs. Schultz implicitly. The evidence for plaintiff justifies the conclusion that there was a conspiracy to defraud plaintiff. If that was the scheme, it worked. A trade was made, plaintiff exchanging her rooming house and a $2,000 mortgage, the two together being worth $8,500 and being the consideration for what she supposed was a two-thirds interest in the Sea Girt property. The other third she understood was being taken by her friend Mrs. Schultz. But the defendants so managed the deal that on the face of the papers when it was finally complete plaintiff did not get her two-thirds interest but only an undivided half. She protested and insisted that she was entitled to definite assurance that her interest was two-thirds. She had put into the exchange the $8,500 of real value already referred to, whereas Mrs. Schultz had turned over a land contract of questionable value. The deal was consummated May 3, 1926. Plaintiff, soon discovering that she had been defrauded, made such vigorous protest that, according to her testimony, there was a mutual rescission June 3, 1926, defendants agreeing to take back the summer resort property and to reimburse plaintiff for her rooming house and mortgage, which, it is said, had speedily passed beyond their control. Defendants deny the rescission but do not deny that June 3, 1926, plaintiff surrendered the Sea Girt place and

its appurtenances to them or to Mabel Hart. Plaintiff has never had anything more to do with it. She has never received a cent of return from it or by way of reimbursement for her rooming house and mortgage.

■ The first of the two groups of assignments of error for serious consideration has to do with the sufficiency of the evidence to sustain the charge of fraud. The value of the Sea Girt property was grossly exaggerated to plaintiff. Defendants' agent, Miss Hart, represented it to be worth easily $26,000. It was then listed for sale with another agency at $16,000. It was probably worth no more. But, according to the contract, plaintiff and Mrs. Schultz were to pay $26,000 for it. Their property, plaintiff's house and mortgage, plus Mrs. Schultz's land contract, were taken in at $11,500. The balance of $14,500 they were to pay to defendants Scott and Colliton in deferred instalments. Apparently it was the part of defendant Schultz to impress plaintiff with the utter dependability of Miss Hart—to prevail upon plaintiff to believe anything and everything that Miss Hart might tell her in a real estate deal. Apparently the job was well done. The evidence discloses misrepresentations of a material nature in respect to matters other than the value of defendants' property. The jury might well have believed that the character and quality of the buildings and their furnishings and the earning power of the resort had been misrepresented. But that point need not be labored, for under the circumstances of this case the gross misrepresentation of value is enough.

It is true, as argued for defendants, that ordinarily, especially where there has been a personal investigation of the property by the alleged victim, it is difficult to make a case of fraud out of misrepresentations of value alone. For obvious reasons the law is slow to consider such a representation as anything more than "dealers' talk," so called, or a mere expression of opinion upon which reliance is not to be placed. But the rule that such misrepresentations are not actionable applies only where the parties are dealing at arm's length. It may not be invoked when a confidential relationship has been made the avenue for a fraudulent invasion of confidence. "If influence be acquired, it must be kept free from

the taint of * * * cunning bargains" such as that which the evidence for plaintiff does not leave much doubt was put over on her. Pinger v. Pinger, 40 Minn. 417, 418, 42 N. W. 289. There is no refuge in the law for one who has enriched himself unconscionably by the abuse of another's trust. And it matters not whether the confidence was reposed in himself or another. It is enough that it has been abused and that the defendant has participated in the abuse and/or knowingly profited thereby. Adan v. Steinbrecher, 116 Minn. 174, 133 N. W. 477.

■ June 3, 1926, so plaintiff testifies, at an interview between herself, Mrs. Colliton, Mr. Scott (two of the defendants) and their agent, Miss Hart, on the Sea Girt property, it was agreed that she should "go back into the city, move back" to Minneapolis. Miss Hart, as their agent, was "going to run this place" for the defendants "this summer." And she was then told by or on behalf of defendants Scott and Colliton, according to her testimony, "if we dispose of the place this summer we will pay you your money when we get some. And if we don't sell it this summer, why this fall we have a mortgage due and we will pay you then. You go back to the city and live. * * * We will give you the paper showing what equity you turned in on the deal [so] that you know how much money you have got coming." Plaintiff said that she then told the others that she "was through with it," and she was. She left the place the next day and has not had anything to do with it since. That testimony is so ample as proof of a rescission that it would probably not be questioned were it not for the fact that on the occasion referred to plaintiff signed an informal document in the nature of a lease. It is as follows:

"For and in consideration of the payment of $666.00 to be paid by Mabel E. Hart (on contract for deed payments to be made to L. F. Scott, et al.), I hereby rent to the said Mabel E. Hart my two-thirds interest in the summer resort known as Sea Girt Inn at Orchard Lake for the season of 1926."

Defendants rely upon the supposed lease as such an exercise of dominion and continued ownership by plaintiff as to show not only

that there was no rescission but also that after discovery of the fraud plaintiff affirmed the contract. But plaintiff's testimony justifies the conclusion that she was again victimized when she was induced to sign the supposed lease. She did so without knowing its contents and after defendant Scott had assured her as follows: "We brought Miss Hart out here today, and she is going to run this place, and you will have to sign a paper to let her run it showing that you have been the former owner of it." Plaintiff then signed the paper without reading it. She did not receive a copy of it and knew nothing about its contents. Plaintiff's actions through the entire transaction, her innocence of business matters and all that, make it exceedingly probable that she could be and was deceived in precisely the manner she says she was. Her testimony does not go at all to vary or contradict a written contract but to show rather and only that what on its face appears to be a contract never became one and was never intended to be one. On plaintiff's testimony her signature was obtained by fraud, and in such case of course the fact may be shown. Van Metre v. Nunn, 116 Minn. 444, 133 N. W. 1012; National Cash Register Co. v. Merrigan, 148 Minn. 270, 181 N. W. 585; Finkelstein v. Henslin, 152 Minn. 386, 188 N. W. 737; Tapager v. Nielson, 153 Minn. 235, 190 N. W. 54.

Order affirmed.